## PENNINGTON v. SMITH et al.

### (Circuit Court of Appeals, Second Circuit. January 7, 1897.)

1. DECREES OF ORPHANS' COURT—TRUSTEE'S ACCOUNT.

S., as executor of his wife's will, held a considerable amount of personal property and some real estate, one-half of both belonging to him under the will, and one-half going to him as trustee for his children. He filed an account of the personalty, in which he charged himself with $13,800, overpaid beyond the actual amount of property received, as if with an asset of the estate, and credited himself with sundry items, including large disbursements for general expenses of the estate and family, and $88,900, paid to himself as trustee for his children, which would be the correct amount of their interest, if the other items were correct, and the $13,800 overpayment represented an actual receipt of property. The account was approved by the orphans' court as filed. Upon the theory that he was entitled to reimburse himself for this overpayment out of the beneficiaries' share of the real estate, he took and deposited with his own funds, in the hands of his second wife, a part of the proceeds of the sale of the infants' share of the real estate. S. having died, and litigation having arisen in the United States circuit court, between his widow and his successor as trustee, seeking to reclaim from her hands the share of the proceeds of the real estate taken by S., the widow claimed the right to show the overpayment, and charge it against the payment to the infants' estate, which the trustee resisted unless permitted to open the whole account, and show that the overpayment was properly chargeable against other items. *Held*, that the circuit court could not go behind the decree of the orphans' court for one purpose, and not for all, and would apply the rule that the adjudication of a competent court will be accepted as a settlement of the questions before it. 75 Fed. 157, reversed.

2. FEDERAL JURISDICTION—CITIZENSHIP OF TRUSTEE OR SPECIAL GUARDIAN.

A testamentary trustee, or a special guardian appointed under a state statute for the sale of infants' land, suing in either capacity, is not a mere guardian ad litem or next friend; and the federal courts have jurisdiction of a suit brought by him against a citizen of a state other than his own.

3. TRUSTEES—DEALINGS WITH TRUST FUNDS—NOTICE TO THIRD PARTIES.

S., who held a mortgage as special guardian and trustee for his children, received a payment on the mortgage in a check payable to him as guardian, which he turned over to his wife, who deposited it in her bank, and afterwards returned a part of the sum to S., and expended a part under his direction for the maintenance of the children. S. claimed a right to the proceeds of the mortgage as his own, which his wife knew; but, it being afterwards held that he was not so entitled, also *held*, in a suit by the successor of S., appointed after his death, against S.'s widow, that she was chargeable with knowledge that the money was a trust fund, and was accountable for all of it but that returned to S., the principal of the trust fund not being applicable to the maintenance of the beneficiaries, and the widow being chargeable with knowledge of that fact.

Appeal from the Circuit Court of the United States for the Southern District of New York.

John B. Leavitt, for appellant.
Alex. Thain, for appellees.

Before LACOMBE and SHIPMAN, Circuit Judges.

LACOMBE, Circuit Judge. Sallie L. B. Smith, the first wife of George Condit Smith, died in July, 1890, leaving two young daughters. She was a resident of New Jersey, was possessed of real and personal property, and left a will, which was duly admitted

to probate in that state.    After the bequest of a few specific legacies, the will provides as follows:

"I give, devise, and bequeath the equal undivided half part of all the rest of my property, as aforesaid, to my husband absolutely, and the other equal undivided half part thereof I give and bequeath, absolutely, to such child or children, and, if children, then in equal shares; but I direct that my husband shall hold the same in trust for such child or children during its or their minority, managing and investing the same according to law, and from time to time applying such parts of the income thereof to the support, maintenance, and education of such child or children as he may think advisable. The determination of my husband as to such management, investment, and application of income shall be final, and without appeal or question, as I have full confidence in his good sense and discretion."

Her husband was appointed executor, duly qualified, and proceeded to administer the estate.    His account as executor was filed in December, 1891, and on February 23, 1892 the orphans' court audited and allowed said account as filed.    It appeared therefrom that the executor had paid to himself, as trustee for each infant, on December 23, 1890, $30,200; and again, on May 25, 1891, $14,250, for each,—the total thus paid being $88,900.    These payments were in fact made by depositing 90 railroad bonds, valued at that amount, with the Central Trust Company, under an agreement which need not be recited, but which made the trust company the custodian of the bonds until the children's majority, with proper provisions for the disposition of the bonds and income therefrom. In July, 1892, George Condit Smith married the defendant Emma Condit Smith, having before that date become a resident of this state.    He died October 7, 1894, leaving the said two children as his only heirs at law and next of kin, and by his will appointed his second wife, the defendant Emma Condit Smith, guardian of his children, and executrix of his estate.    During the progress of this case through the circuit court, she received letters testamentary and of guardianship, in conformity with such appointment.

A portion of the residuary estate of the first Mrs. Smith consisted of a house and land in East Orange, N. J.    Having removed from that state, it seemed to Smith desirable to sell this real estate; and in January, 1893, proceedings were begun in the court of chancery for New Jersey, under a statute entitled "An act relative to the sale and disposition of the real estate of infants."    Revision, p. 481, approved March 27, 1874.    That statute provides for the appointment of a special guardian to sell such lands, when the court may be satisfied that such sale is for the interest of the infants, and further provides as follows:

"Sec. 5. No sale of any real estate made in pursuance of the provisions of this act shall give to any person any other or greater interest in the proceeds of such sale than he or she would have had in the lands, provided the same had not been sold; but the said proceeds shall be considered relative to the statutes of descents and distribution, and for every other purpose as real estate of the same nature as the property sold."

"Sec. 9. When any special guardian appointed under this act shall have sold the lands and real estate of the infant, and his account been presented and approved by the chancellor, it shall be lawful for the chancellor to make an order directing the said guardian to pay the proceeds of such sale, after deducting such commissions and expenses as shall be allowed by the chancellor, to the general guardian of the said infant; and upon the payment to the general guardian

of the amount ascertained by the chancellor to be due to the infant in the hands of the special guardian, and the assignment of the securities held by him in case the money has been invested by order of the court, the special guardian may by an order of the chancellor, be discharged from further duties and liabilities in relation to his office; and the receipt of the general guardian for the moneys and securities so ordered to be paid and transferred shall be a sufficient release and discharge of such special guardian from his trust."

Smith's petition for sale of this real estate being presented to the court of chancery, the matter was referred to a special master to investigate and report. The master, after investigation, reported in favor of a sale; also, that:

"George Condit Smith, the father of the infants, is the sole executor of the will of his first wife, under which will the said infants became entitled to their interest in said lands, and that he is by said will appointed trustee to hold the said lands in trust for the said infants during their minority; that he is * * * a suitable * * * person to be appointed special guardian of the said infants to sell the said lands."

Upon this report and a "consent waiver" of Smith annexed thereto, whereby he agreed to release his curtesy in said premises, and to unite in the sale and conveyance of the same individually, and as trustee under the will of his late wife, and also as individual beneficiary of one-half of the property under the will, the court of chancery appointed Smith special guardian, and ordered a sale of the infants' right and title to such real estate for the sum of $13,750. It was further ordered that the net proceeds be put at interest by said guardian under direction of the chancellor, on good security, by bond and mortgage, for the benefit of said infants, and that the guardian make a report. Before this order was made, a conditional agreement of sale had been made with one Crossley, for $5,000 cash, and the rest of the sum of $27,500 to be paid in half-yearly installments of $5,000 each, all unpaid balance to be secured by purchase-money mortgage. This agreement was approved by the court of chancery, and sale ordered in conformity thereto. On April 8, 1893, Smith, as special guardian, reported that he had sold the premises for $27,500, of which one-half ($13,-750) belonged to the infants; that the costs and expenses of the proceeding amounted to $393.13, and that he had "invested the balance of said money belonging to the infants in the purchase-money mortgage executed by Rena P. Crossley and husband on the premises sold, giving to myself, as special guardian of the said minors, a prior lien in said mortgage to the extent of the sum of $13,356.87, the balance of the said money due to the said minors. The said mortgage bears 5 per cent. interest, and is payable in two years from the date thereof." What the amount of this mortgage was, the report of the special guardian does not disclose. It appears from the record on this appeal that the Crossleys paid $10,000 in cash, and that the purchase-money mortgage secured a bond to Smith, "personally and as such special guardian," in the sum of $17,500; $5,000 to be paid March 20, 1894, $5,000 on September 20, 1894, and the balance on March 20, 1895. At the time of making his report as special guardian, Smith filed a declaration of trust (duly recorded), by which he declared that, as special

78 F.—26

guardian in chancery of the said infants, he held the said mortgage as such special guardian to the extent of $13,356.87; and he further covenanted as follows:

"Said sum belongs to me as such guardian as a prior lien on said mortgage, and that my individual right in said mortgage money and interest is subject to said amount due to me as special guardian as aforesaid, with interest, I having individually received all the net proceeds of cash that came from the sale of said lands; my intention being to invest all my children's shares in the proceeds of sale in said mortgage as a prior lien, the balance only belonging to me individually."

Subsequent to the filing of Smith's report as special guardian, no further steps appear to have been taken in the court of chancery touching this proceeding during his lifetime. There is nothing to show that this account was approved by the chancellor; and no order was ever made directing him to pay the net proceeds to the general guardian of the infants. He died still special guardian, under this act, and with the trust such act imposed undischarged. That act undoubtedly required the special guardian to hold the proceeds in trust for the infants until they came of age or died, or until the court of chancery, under the ninth section of the act, might relieve the special guardian from further duty; and none of these contingencies had happened when Smith died.

On October 16, 1894, upon a petition of the infants "by J. Condit Smith, their next friend," the complainant, William Pennington, a resident of New Jersey, was appointed by the court of chancery of that state trustee for the infants severally, "in the room and stead of George Condit Smith, deceased, to execute the trusts mentioned and declared in and by the last will and testament of Sallie L. B. Smith, deceased, * * * with all the rights, powers, duties, and privileges incident to the appointment." Pennington was required to give bonds in the amount of $60,000, as trustee for each child, and has so done. On October 17, 1894, the same court of chancery, on a like petition in the matter of the sale of the infants' lands, appointed complainant "special guardian in the place and stead of George Condit Smith, special guardian, deceased, for [said infants] severally, with all the rights, duties, and privileges incident to the appointment."

On October 18, 1894, this suit was brought. Before going into any statement of the facts constituting the alleged cause of action, it will perhaps be not inappropriate to state that, from an examination of the record, we are satisfied that both parties, the complainant, Pennington, and the defendant Emma Condit Smith, are sincerely solicitous to protect the interests of these little children. Those interests would, we doubt not, be conscientiously looked after whether the legal obligation to do so rested upon the complainant, at one time their father's legal adviser, and apparently for many years their dead mother's friend, or upon the defendant, their stepmother, who, receiving them in their infancy, has tenderly cared for and nurtured them, and been to them the only mother that they have ever known. This circumstance makes it most unfortunate that the parties could not have come together before suit was brought, and, appreciating the situation which had been

brought about by George Condit Smith's careless methods of doing business, have reached some agreement, which would have fully protected the interests of the infants, without the harassment and expense of this suit. From letters put in evidence, it appears that defendant declined to meet the plaintiff, and discuss the situation, being led to believe that he had asked for an interview, not as a friend of the children, which she knew him to be, but as the representative of certain of her husband's relations, whom she seems to have had good reason to dislike. In declining to meet him, she states that her family would under no circumstances permit her to confer with him. In this particular they proved to be reckless and incompetent advisers, and it is to be regretted that defendant did not follow her first impulse, and confer with the plaintiff. Such conference could not have proved otherwise than helpful. The facts out of which this cause of action arose will next be set forth.

At the time of Smith's marriage to his second wife, he was practically without means. The money he had received from his first wife had been spent and lost, much of it, no doubt, in improvident investments, into which he appears to have been led by a brother, J. Condit Smith. About a year afterwards, he met with an accident, which injured his hand, so that he could not write; and thereafter he kept no bank account, but, whenever he had occasion to avail of bank facilities for deposit or check, used the bank account which the defendant Mrs. Emma Smith kept, in her own name, with the Fifth Avenue Bank. There remained to him, however, as we have seen, the balance of the Crossley mortgage over and above the $13,356.87 prior lien which he held as special guardian for his children. He seems, moreover, to have believed that he was entitled to appropriate to his own use the $13,356.87, as an offset to a supposed "overpayment" by him, as executor, to the trust funds of the infants, which he had lodged in the Central Trust Company. This question of alleged overpayment will be examined critically hereafter. For the present it is sufficient to say that the accountant who prepared his account for the orphans' court called his attention to the fact that the aggregate of all the schedules of executor's credits exceeded the total amount realized from the estate in the amount of $13,826.89. Thereupon he charged himself with this amount, so as to make his account balance, and said to the accountant that, "as the only piece of property belonging to the trust estate was the house in East Orange, he would apply any overpayment that he had made to the children in the trust, together with any expenditures or payments that he might make for the trust estate, as an offset to their interest in the East Orange property." Inasmuch as he subsequently stated to another witness that his children "practically had no interest in the mortgage, as he had already deposited in the Central Trust Company the equivalents of what their share would be," it is evident that he supposed that this overpayment by him as executor had been made, not only solely on "Schedule F, Payment of Legacies,"

but also solely on the items of that schedule which represented the payments to his children. Upon what theory he based his supposition the record does not disclose, and we are at a loss to conceive. Of course, it is not material to the issues raised in this case to ascertain what might be George Condit Smith's conception of his rights, but it has seemed proper to state it in order to avoid any inference that in his subsequent transactions he had any intent to despoil his children of anything which might belong to them.

On March 20, 1894, the mortgagor under the Crossley mortgage paid off $5,000 of the principal of the mortgage, by check to the order of George Condit Smith, who gave receipt therefor "personally and as guardian of Louise Condit Smith and Sallie Barnes Smith." No one here disputes the proposition that, out of this $5,000, Smith was entitled to retain his individual share in the mortgage, $4,143.13. The balance only—$856.87—is claimed to be infants' property. This check was indorsed by George Condit Smith individually, was transferred to Mrs. Emma Smith, and by her deposited in the Fifth Avenue Bank. On September 25, 1894, the mortgagor made another payment of $5,000, by check, to the order of George Condit Smith, guardian. This was indorsed, "George Condit Smith, Guardian," was transferred to Mrs. Emma Smith, and by her deposited in the Fifth Avenue Bank. Twelve days later, George Condit Smith died. The complainant, suing as trustee, contended that $5,856.87 (the infants' share of the $10,000 paid in) was to be considered as real estate belonging to the testamentary trust created by Sallie Smith's will; that this money was received by Emma Smith with knowledge; and that complainant was entitled to follow and reclaim that sum. Subsequently, by an amended complaint, the appointment of Pennington as special guardian was set up. Prior to the commencement of the action, Mrs. Emma Smith's account in the Fifth Avenue Bank had been drawn down to a balance of $4,110.50. A preliminary injunction preserved the status quo until final hearing.

The case came up for hearing upon bill, answer, and proofs in June, 1895. The opinion of the circuit court will be found in 69 Fed. 188. That court held that plaintiff was properly appointed trustee, and was entitled to sue as such. There seems to have been no contention that the will of Sallie Smith did not create a trust, and no pretense was made that either of the defendants had any title to the trust fund, in which respect the subsequent appointment of Mrs. Emma Smith as guardian of the children under her husband's will works no change. "That appointment," in the language of the circuit court, "would not give her the right to hold funds which his will could not touch, and which he held only as trustee." That court also states that "no defense on the merits is urged, but the attempt is made to defeat the complainant by defenses in the nature of demurrers." Finding these defenses to be unsound, it held that of the first payment of $5,000, March 20, 1894, all but $856.87 was properly applied by George Smith to the extinguishment of his individual interest in the mortgage, and that, as

there was nothing upon the check to indicate that it related to trust funds, Mrs. Smith could not be required to account for this $856.87, if she had checked it out in good faith. It further held that as to the $5,000 check of September 25, 1894, Mrs. Smith must be charged with notice that it was trust funds, but that she was not to be charged with so much of it as she may have paid to the deceased trustee, or disbursed by his direction for the purposes of the trust. And the case was sent to a master to ascertain and report what balance of the $5,856.87 there was in the bank, and how the rest of it had been disbursed. Much testimony was taken before the master, who reported that the balance in bank was $4,110.51; that the $10,000 represented by the two checks was deposited to the credit of defendant Emma Smith, who regarded said deposit as belonging to her husband, and drew her checks thereon as requested by him, and expended portions thereof under his supervision and direction; that she withdrew by checks on said deposit, and returned to her husband the sum of $3,220.75; that, with his approval, she paid and expended for his infant children interested in the estate a sum of, at least, $1,589.80; that, under like approval and authority, the sum of $1,078.94 was used to defray household, medical, traveling, and incidental expenses of said George Condit Smith and his family, leaving a balance on deposit, as hereinbefore found, of $4,110.51. The master further reported that defendant Emma Smith did not treat said moneys as her own, to do with as she pleased, but as moneys subject to the order and direction of her said husband, and that she did not use any portion for her individual use and benefit, save as a member of the family of her husband, for which a portion was expended. And the master further reported his conclusions from these facts. Complainant filed exceptions to the master's report. Defendant filed no exceptions, apparently relying on certain testimony as to the "overpayment," which had been taken before the master by stipulation. The opinion of the circuit court upon final hearing on these exceptions and this evidence will be found in 75 Fed. 157. The result of final hearing was a dismissal of the bill. The reason for thus disposing of the case is succinctly stated in the opinion, as follows:

"With the sanction of the orphans' court of Essex county, New Jersey, there was deposited with the Central Trust Company of New York the sum of $88,900, in trust for the benefit of the minor children of George Condit Smith. This was in 1890 and 1891. The balance of the Crossley bond and mortgage—$7,500—is still in the hands of the trustee for the benefit of the infants, making a total of $96,400. It further appears that the entire trust fund due the infants under the will of their mother, including both real and personal property, was $95,338.43. In other words, the trust estate had already received $1,061.57 more than it was entitled to receive under the will creating it. That being so, it is hard to discover any principle of equity which will justify the court in taking $5,000 more from the estate of the deceased trustee, and adding it to the fund of the infants."

From other remarks in the opinion, it may be inferred that the judge supposed that complainant practically conceded that the defendant Smith was equitably entitled to the relief she asked for, **and that the only grounds of objection to her obtaining it in this**

action were wholly technical. The judge evidently assumed that it was not disputed that the entire trust fund due the infants under their mother's will was only $95,338.43. We do not, of course, know how the case was presented on argument below; but in this court the appellant vigorously disputes these conclusions, and the soundness of his contention can be determined only from the record presented here.

This statement of the facts is unusually long, but it is thought that a complete presentation of the facts will render unnecessary the discussion of many of the points of law which have been argued upon this appeal. Inasmuch as the judgment at final hearing was wholly in favor of defendants, the assignment of errors does not present the questions which were decided adversely to defendants on the interlocutory hearing, and which the circuit court did not thereafter reconsider. In order, however, to finally dispose of the whole case, all the points presented upon argument by both sides will be considered.

### As to the So-Called "Overpayment."

By the account filed in the orphans' court it appears that George Condit Smith, as executor, paid to himself, as trustee, for his children, $88,900. No one disputes this, but complainant suggests that whereas it appears by the receipts of the Central Trust Company that he deposited with that company for the infants, at one time, 60 $1,000 bonds of various railroads, and, at another time, 30 similar bonds, it does not appear what, as trustee, he paid for these bonds, or whether they were then worth $88,900. Complainant therefore contends that if the filed account is not to be treated as a finality, if it is to be opened to allow defendant, as George Smith's executrix, to make claim for an overpayment, the facts upon which such overpayment is asserted should be proved by competent evidence dehors the filed account. The infants' share of the real estate is, concededly, $13,356.87. If, therefore, it should be found that the infants' share of residuary personal property was $88,900, then they would be entitled to $102,256.87, but have only received $88,900 (assuming the bonds were bought for that sum) plus $7,500, the balance of the Crossley mortgage, making in all $96,400 only.

What, then, are we to take as the infants' share of the personal property? We begin with a finding of the orphans' court that it was $88,900, for that court found Smith's executor's account "to be correct in all particulars," and "allowed [the same] as reported," and certain items of Schedule F of that account are of payments to the infants' trustee, aggregating that sum. If such payments were found by the orphans' court "to be correct," that court must have held that the infants' trust fund was entitled to receive $88,900. Defendants' contention, however, is that such finding is not correct, and that all parties being now before the circuit court, sitting in equity, the proper correction can be made, such correction being properly inferable from the account itself. That complainant's opposition to this attempt collaterally to review the decision of

the orphans' court is by no means wholly technical will be apparent when the account itself is examined. Its summary is as follows:

### Debtor.

This executor charges himself as follows:

| | |
|---|---|
| To amount of inventory............................................ | $184,392 77 |
| "    "    " interest received as per Schedule A................ | 6,496 00 |
| "    "    " increases in value over inventories, as per Schedule B. | 22,425 00 |
| "    "    " one pair horses omitted from inventory, appraised value ...................................... | 400 00 |
| "    "    " schedule of balance, being amount overpaid by the executor ..............................:....... | 13,826 89 |
| | $227,550 66 |

### Credits.

This executor prays allowance as follows:

| | |
|---|---|
| By amount paid for funeral and medical expenses, as per Schedule C. | $ 2,582 68 |
| " amount of claims of creditors allowed and paid, as per Schedule D. | 5,143 26 |
| " amount of general expenses of the estate and family since the decease of testator, as per Schedule E.......................... | 12,619 72 |
| " amount of moneys paid to legatees, as per Schedule F........... | 206,505 00 |
| " amount of errors in inventory, as per Schedule G.............. | 700 00 |
| | $227,550 66 |

It thus appeared that the total amount realized by the executor from every source was $213,023.77. This sum is ascertained by adding together the first four items on the debtor side, and deducting the $700 for errors in inventory, as per schedule G. The executor, however, had paid out $226,850.66, which is the aggregate of all the credit items except the $700 for errors in inventory. Manifestly, he had "overpaid" $13,826.89; but on which schedules did he overpay it? That was a question to be decided by the orphans' court, and certainly that court never would have passed the account while there remained such an unanswered question. The answer would have been found by a careful examination into all the items of the account, and, when found, the proper corrections would have been ordered before final approval of the account would be adjudged. The executor, however, withdrew such question from the consideration of the court, by charging himself with the overpayment; and, there being no longer any such question, the executor thus, in open court, withdrawing all claim to reimbursement for overpayment, his account was allowed as filed. He now asks, or, rather, his executrix on behalf of his estate asks to be allowed to charge that overpayment against one only of the schedules, and against the items on that schedule representing payments of residuary legacies, contending that the residuary personal estate should be taken as $163,963.11 only, and the infants' one-half as $81,981.56; thus seeking to go behind the decree of the orphans' court, but at the same time insisting that such decree is to stand as an approval of the other schedules, C, D, and E. There seems to us to be no equity in such a contention. Either the decree of the orphans' court must be accepted as final, or else the executor's representative must allow a re-examination of all the questions settled by the court. This court cannot go back of that decree only

so far as may help him, and come to an abrupt stop as soon as a
revision of the account may hurt him.    The orphans' court had
jurisdiction to make this decree, and its decision should not be re-
viewed collaterally here; for this court is wholly without the evi-
dence which that court might have had, had this question been
raised there.    Certainly, this court cannot assume that, if the
executor had not of his own motion charged himself with his im-
provident overpayment of $13,826.89, the orphans' court would have
approved all the items which make up Schedules C, D, and E.
From what is shown of George Condit Smith's generous, free-heart-
ed disposition and loose business methods, it is reasonable to
suppose that part, at least, of his improvident overpayment, will
be found in these schedules.    It appears that, under the practice
in New Jersey, it is customary and proper to charge the estate of a
deceased person with the general household and family expenses
for a year after death; but surely the amounts charged for such
expenses must be reasonable, and not extravagant.    As shown
above, the executor charges $12,619.72 for such expenses, and the
items of the schedule include $635 for a carriage, $335.95 for har-
ness, and nearly $700 for livery-stable bills.    These charges may
be right and proper under the New Jersey practice, but that is a
question for the New Jersey court to determine.    This court cer-
tainly cannot pass upon it without any proof.    Again, it will be
noted that the total income of the estate during the year is given,
in Schedule A, as $6,496.    This includes an item of $1,102 for dis-
count on a cash payment of specific legacy of $23,000, so that the
actual income was $5,394 only.    It is certainly inconceivable that
an orphans' court would approve of charges for household and fam-
ily expenses during the year after death, which would use up the
whole income, and over $7,000 of the principal besides.    Of course,
so long as the executor stood before the court, charging himself
with a sum greater than the whole amount of these general family
and household expenses, there was no necessity for reviewing any
of these items; but it would be clearly inequitable to allow his rep-
resentative now to alter his account by striking out any part of
the charge against himself without again presenting his claim of
credits under Schedules C, D, and E for examination and revision.

For these reasons, we are of the opinion that the wholesome rule
which accepts the adjudication of a competent court as a settle-
ment of the questions before it should not be departed from or
qualified in this case.

### As to the Estate Created by the Will.

Defendants contend that no trust was created by the will of Sal-
lie Smith.    It would seem reasonably plain from the clause of the
will cited at the beginning of this opinion that the testatrix in-
tended to create a trust, and used words apt for the purpose when
she wrote:    "I give and bequeath [this estate] absolutely to my chil-
dren, but direct that my husband shall hold the same in trust for
them during minority."    But there need be no extended discussion
on this point.    What form of words may be required to create a

testamentary trust in New Jersey is a question of local law. The court of chancery in that state, by its appointment of complainant as trustee, has indicated that, in its opinion, there is a trust to be administered. No reason is shown for declining to follow that ruling in the federal courts.

### As to Complainant's Right to Sue in a Federal Court.

Diversity of citizenship between the parties is set up in the amended bill, and proved. Whether complainant be regarded as a testamentary trustee under the will, or as a special guardian under the New Jersey statute for the sale of infants' real estate, he is certainly not a mere guardian ad litem or next friend, as in the cases cited by appellees; and it is on his citizenship, not on that of those he represents, that the jurisdiction of the federal courts must stand. Coal Co. v. Blatchford, 11 Wall. 172. That complainant, as trustee or special guardian, may sue without ancillary appointment; that there was nothing in the case to justify the circuit court in declaring the action of the court of chancery in appointing him to be improper; that the New Jersey court did not lose jurisdiction because George Condit Smith moved to New York, and died here,—were the conclusions of the circuit court, and it is sufficient on these points to refer to its opinion on the interlocutory hearing.

And the same may be said of the contention that the action is one for money had and received, and should have been brought on the law side of the court.

To the proposition that the proceeding under the New Jersey statute to sell infants' land can only be maintained when the title to the real estate is in the infants, not when it is in a trustee, it is sufficient to say that the court of chancery of New Jersey, apprised of the fact that title to this real estate was in a trustee, nevertheless ordered its sale under that statute. It may fairly be assumed that the court of chancery correctly interpreted the statute of its own state.

### The Amount for which Defendant Emma C. Smith should Respond.

We are clearly of the opinion that upon the evidence as to the first $5,000 check, of March 20, 1894, she is not chargeable with knowledge that any part of the same was trust funds, and not money to which her husband was himself entitled. She had been informed by Pennington that the interest of her husband in the Crossley mortgage was $4,143.13 only, and by her husband that he was entitled to the whole amount of that mortgage. When he brought her for deposit a check for $5,000, drawn by Crossley to himself personally, she might with reason believe that her husband's statement was correct, or, at least, that $5,000 of the mortgage belonged to him individually. Inasmuch as, long before this suit was brought, she returned part of this money to him, and spent the residue in accordance with his directions or with his assent, she cannot be held responsible for it, and it is wholly immaterial to inquire for what she spent it. Even if she spent it on herself, or used it to repay some of the many loans she had theretofore made to her husband, she is under no obligation to account for it to the complainant,

who does not represent George Condit Smith individually, from whom, as an individual, she received the money.

The second $5,000 check, of September 25, 1894, however, was drawn to her husband's order, as "guardian," and indorsed in like manner. While we find no evidence in the case which will warrant the finding that she was a fraudulent transferee, we are satisfied that she must have known that these were trust funds, a part of the infants' estate, which had formerly been invested in this Crossley mortgage, and that she is to be treated as a banker who is chargeable with knowledge that, in the general account of his customer, there have been deposited moneys which such customer holds in trust for another.

We do not understand that defendants dispute the finding of the master that, out of the moneys so received from George Condit Smith, there remained in the Fifth Avenue Bank, on the day Emma Condit Smith's balance was impounded by preliminary injunction, the sum of $4,110.50; nor that, if the other points raised (as to noncreation of trust, incompetency of complainant to sue, overpayment by Smith, notice to defendant that the $5,000 check represented trust money, etc.) be decided adversely to defendant, that sum belongs to the trust, and the trustee is entitled to recover it. The only question remaining is as to $889.50, the amount disposed of by her out of the second $5,000, before injunction. Of this it appears that on October 3d she returned to her husband $75.75. This she had a right to do. From him, as trustee, she received it; against his demand for its return, so long as he remained trustee, she could not hold it; and, returning it to him, she was entitled to rely on his disposing of it as the trust required. As to the balance of $813.75, she shows the payment by her, under her husband's direction, or with his assent, of considerable sums for clothing and support of the children. Whether the sums applied by George Condit Smith from the income of the trust fund to the "support, maintenance, and education" of the infants were extravagant or not, is a question with which the court has no concern. By her will, Sallie Smith left that matter to her husband, declaring that his determination thereon should be "final and without appeal or question." He was given an equally large discretion as to managing and investing the principal, but that gave him no authority to divert such principal, and apply any part of it to the "support, maintenance, and education" of the infants. The judge who heard the case in the circuit court has forcibly expressed this distinction:

"Undoubtedly, the will * * * gave him a large discretion. He might have wasted the entire fund by bad investments, and the complainant would be remediless. It is even possible that had he invested the fund with the defendant, taking nothing but her unsecured note in return, the transaction could not be questioned. But there is no pretense of anything of this kind. A trustee cannot despoil the trust by turning the property into money, and handing the money to his wife. Putting the property out of his hands is not investing it."

The second $5,000, received on the Crossley mortgage, was principal; and George Smith had no right to use it himself, or to

direct his wife, as his banker, to pay it out for "maintenance or support" of the infants. Mrs. Emma Smith is chargeable with knowledge that this particular sum belonged to the infants' principal, and no payments for such purposes made from it, even under her husband's directions, are properly chargeable against the fund thus held by her with notice of its character. The trustee is therefore entitled to the $4,110.50 still in the bank, and to the $813.75 which she has paid out,—a total of $4,924.25.

The facts warrant a finding that when George Condit Smith deposited the second sum of $5,000 with the defendant, to be held by her subject to his future directions, the deposit was made and received upon an understanding that the bailee was not to pay interest. When, however, George Smith having died, and a new trustee having been appointed in his place, demand was made by such new trustee for the return of the money, the defendant was in default for failure to do so, and interest would begin to run. Nor is it any ground for refusing to allow interest that part of the proceeds was impounded in the Fifth Avenue Bank by the injunction order. Defendant could have released it at any time by withdrawing any further opposition to the claim of the new trustee. If, however, it be made to appear to the circuit court that the Fifth Avenue Bank pays interest at some agreed rate upon daily balances, the amount thus earned from the bank by the fund should be deducted from the interest to which, as against the defendant Emma C. Smith, the complainant is entitled, viz. at legal rates on $4,925, from October 18, 1894, the date of commencement of this suit.

The decree of the circuit court is reversed, with costs, and cause remitted to that court, with instructions to enter a decree in accordance with this opinion.